OPINION OF THE COURT
David A. Weinstein, J.
Claimant Haluk Gani commenced this action by claim filed August 29, 2008, in which he alleges that he came to the United States to attend SUNY Maritime College (SUNY Maritime), but his application to obtain legal status as a student was rejected by the United States Citizenship and Immigration Services (USCIS) because of errors made by school officials, and in particular by International Student Coordinator Natalie Caesar. Specifically, Gani alleges that Caesar compiled and sent his application to adjust his status to that of student via DHL Express shipping on November 30, 2006, but when Gani followed up on the progress of the package DHL had no record of the tracking number (claim ¶¶ 15-16). Ultimately, Caesar informed Gani in an email that USCIS had received his application, and she provided him with a file number that she believed was associated with that application. That statement proved erroneous, however, as the application had in fact never been received, and the file number merely identified the record of Caesar’s call (id. ¶¶ 19-20). Gani ultimately submitted a second application to USCIS, but that was denied, along with subsequent applications to reopen and reconsider (id. ¶¶ 25, 26, 30).
The claim further alleges that the change of status denial was based on Gani’s violation of “applicable immigration rules,” *743 which took place through no fault of his own {id. ¶ 27). Although the claim does not so state, the evidence at trial made clear that the referenced violation was Gani’s taking of classes during the pendency of his application to obtain status as a student. This act, it turned out, was in violation of immigration law, but he contends was undertaken based on Caesar’s erroneous advice.
On the basis of the foregoing, claimant maintains that defendant State of New York “owed Gani a duty of care springing from a relationship of trust or confidence” (id. ¶ 33), Gani had a concomitant right to rely on the State’s representations (id. ¶ 34), and the State damaged Gani by making “repeated fraudulent representations” about his immigration application on which Gani relied to his detriment (id. ¶ 35). Specifically, claimant asserts that “solely as a result of the negligence of the defendant[ ] . . . Gani was denied his application to change his visa status to an F1 student visa” (id. ¶ 37), and thereby became ineligible “to complete a post-graduate academic degree at SUNY Maritime College” (id. ¶ 38).
The claim states that the “full nature and extent” of Gani’s injuries were unknown at the time of its filing (id. ¶ 39). As set forth in more detail below, claimant acknowledged at trial that he was, in the end, able to graduate from SUNY Maritime, and through marriage to obtain United States citizenship. He nevertheless asserts, at trial and in his posttrial submissions, that he was harmed by defendant’s conduct, since he was unable to accept a job offered to him during the time he was without legal status in the United States.
The State interposed its answer, which raised as its fifth affirmative defense that “[d]efendant through its agents and/or employees took actions which were privileged as being discretionary determinations made by such agents or employees while acting within the scope of their duties as public officials, and therefore defendant is immune from any liability for such actions” (answer ¶ 12).
A liability trial on this matter was conducted on August 14 and 15, 2013. At trial, claimant presented his own testimony, as well as the deposition transcripts of Caesar, SUNY Maritime Provost Dr. Joseph Hoffman, and Dr. Larry Howard, the Chair of the SUNY Maritime Department of Global Business and Transportation and Caesar’s direct supervisor. For its part, defendant called Caesar to testify on its behalf, and both parties submitted various documentary exhibits. The facts adduced at *744 trial are summarized below, with differences in the witnesses’ accounts noted.
Gani is a Turkish national who obtained a B1/B2 temporary-visa to visit the United States from the United States Consulate in Turkey in September 2005 (claimant’s exhibit 11).[1] Under that visa, he first came to this country in September 2006 (see defendant’s exhibit E). The visa allowed him to stay in the United States only until March 20, 2007 (trial tr at 28; claimant’s exhibit 7 at 16).
In November 2006, claimant visited SUNY Maritime with a friend who attended the university. During the visit, he met with Caesar, who served as the International Student Coordinator and Principal Designated School Officer (PDSO).[2] Gani testified that he understood Caesar’s role to involve “enrolling] the international students . . . [and] arranging] everything for their enrollment” (tr at 14). For her part, Caesar identified a PDSO’s tasks to primarily include signing off on international students’ documentation relevant to their immigration status (Caesar deposition at 30). She acknowledged that the PDSO also was responsible for understanding the relevant provisions of the Code of Federal Regulations (tr at 134). Caesar, however, was not (and is not) an attorney (tr at 173).
Gani met Caesar a second time on November 29, 2006, on which occasion she assisted him with his application for the school, and provided him with an acceptance letter (tr at 16; claimant’s exhibit 6). Gani then had two options to obtain legal status as a student in the United States: first, he could return to Turkey and apply for an F-l student visa at the United States Consulate there (tr at 103),[3] or second, he could remain in the United States and file an 1-539 application (Application To *745 Extend/Change Nonimmigrant Status) to adjust his status to that of a full-time F-l student (tr at 104, 107).[4]
In either case, the student must first obtain a document known as a form 1-20 from the school he or she will attend, based on a showing that the student has the financial wherewithal to support his studies without becoming a ward of the state (tr at 103, 115). According to Gani, Caesar did not give him the entire form required to request an 1-20, but only certain pages thereof on which he had to provide information and his signature, while Caesar filled out the rest (tr at 18-19, 41, 49-50). For her part, Caesar testified that Gani filled out the 1-20 application except for one part left blank, and she then entered that information into the “Student & Exchange Visitor Information System,” the computer system employed by USCIS, and by which the actual 1-20 document was prepared (tr at 113, 130-132).
According to Gani, Caesar explained that it was possible for him to enroll at the school and start his studies towards a Master’s degree while his application to change his immigration status to an F-l student was pending (tr at 15, 22). While Caesar did not specifically admit having given such advice,[5] she acknowledged that at the time, she wrongly believed the relevant federal rule allowed foreign students to take classes while awaiting decision on their 1-539 application (see Caesar deposition at 162). In fact, however, an interim rule promulgated by USCIS in 2002 changed that policy, and forbade students temporarily present in the United States pursuant to a B1/B2 visa from taking classes until their new status was approved (see claimant’s exhibit 23).
Gani signed his 1-539 application on November 30, 2006. In it, claimant stated that he wanted to begin his classes in the spring of 2007, and certified that he sought “to enter or remain in the United States temporarily, and solely for the purpose of *746 pursuing a full course of study” at SUNY Maritime, after which he would “continue [his] career in [his] own country” (claimant’s exhibit 7 at 1, 18-19; see also tr at 63 [application “indicated that (Gani was) going to move back to Turkey when (he was) finished with school”]).
Caesar stated that Gani was also given an informational packet (tr at 111-112). Instructions relating to the 1-20 form were introduced into evidence, and contained the following statement:
“If you use a B visa to enter the U.S., you are saying T’m here as a visitor’ only. Since you contacted our school about study, this would be viewed as a ‘fraudulent entry’ and you could be refused permission to stay longer than six months or to extend or change your status. Do not listen to people who say it is easy to enter the country as a visitor and change your status. It is not true! B visitors are prohibited by U.S. law from pursuing a full course of study prior to obtaining a change of status to F-1 student” (claimant’s exhibit 3 at 2).
These instructions further indicated that the applicant is “not permitted to work off campus or to engage in business without specific employment authorization” (claimant’s exhibit 7 at 2).
Gani stated, however, that he had never seen the 1-20 background packet (tr at 188). Further, Howard testified at his deposition, that handouts given to international students were revised regularly (Howard deposition at 32), and Caesar acknowledged that she did not know if the document was prepared subsequent to Gani’s attendance at SUNY (tr at 180, 182).
Caesar informed Gani that she would submit his 1-539 application to USCIS via DHL (tr at 24), which she did as a matter of practice. At her deposition, she agreed that the school “accepted the responsibility to send in students’ 1-20 and 1-539 forms into USCIS . . . .” (Caesar deposition at 46-47.) She testified, however, that it was the student’s obligation to follow up with USCIS to ensure that the submission is received (id. at 47; see also tr at 119 [student’s “obligation” to ensure package’s receipt]). At trial, she stated that SUNY performed the mailing only as a “courtesy,” because of the cost to the student of sending such a package (tr at 149).
According to Caesar’s testimony, on November 30 she brought the application to the State Police office on campus for pickup *747 by DHL, and gave Gani the tracking number for the package (Caesar deposition at 66-67). Gani informed Caesar via email the next day that the tracking number was not working, and that DHL had confirmed to him that it had no record of the number (id. at 67; claimant’s exhibit 8). By a subsequent email on December 17, Gani indicated that he was “[a]waiting [Caesar’s] update information” on the tracking number (claimant’s exhibit 9). Caesar responded on December 21, 2006 as follows: “Your information for the change of status has been submitted[.] I received confirmation when I called USCIS as I do to check on cases every Thursday” (claimant’s exhibit 10).
Gani testified that he felt “relieved” after seeing the December 21 email, since it led him to believe that “everything [was] in order” (tr at 27). He started classes that January (id. at 28), but continued to stop by Caesar’s office from “time to time,” to check on the status of his application verbally (id. at 28-29; see also Caesar deposition at 74 [Gani spoke to her about the application 20 or 30 times]). He also continued to check the tracking number with DHL, notwithstanding that DHL had informed him that it had no record of the package (tr at 29, 52). Gani also determined from his bank account that the check he had sent to USCIS with the application had not been cashed (id. at 57-58). Until March 2007, however, he did not follow up directly with USCIS, in light of the assurance given him by Caesar (id. at 59).
As both parties now acknowledge, the information given by Caesar regarding receipt of the application by USCIS was incorrect. Caesar testified that she had mistakenly understood a number assigned to her inquiry by USCIS to be an identification number for Gani’s application (id. at 122). She stated that she later contacted USCIS again, and learned of her error (id.); she did not, however, recall at what point in time that conversation took place (Caesar deposition at 82, 84). Indeed, while Caesar spoke to USCIS every Thursday concerning various matters, she did not check up on Gani’s application status during those conversations in the weeks immediately following her December 21 email (tr at 157).
Claimant testified that during one of his visits to Caesar’s office, she spoke with immigration officials in an effort to locate *748 his file, and they were unable to do so {id. at 30).[6] By letter dated April 13, 2007, USCIS wrote Gani, stating that he or his school’s “designated representative” had contacted USCIS, and it had been unable to find his application (claimant’s exhibit 13). Caesar stated that she advised Gani during this period that he could call either USCIS or send in another application — but as to the latter option USCIS had told her that the pendency of two applications, if it came to that, could be problematic (Caesar deposition at 79).
Gani wrote Caesar on May 10 to indicate that he had called USCIS, which again stated that it had not received his application, and that he should contact his school. In a subsequent exchange, Caesar “immensely apologize[d],” and said that she would resend the application (claimant’s exhibit 16).[7] According to Gani’s testimony, Caesar also counseled him to continue attending classes (tr at 31).
In a letter to claimant dated August 19, 2007, USCIS denied Gani’s application to extend his stay and change his status. It stated that the application did not “warrant the favorable exercise of the Attorney General’s discretion,” since Gani did not file it until May 21, 2007, after his B1/B2 status had expired (claimant’s exhibit 14). The letter advised that Gani was now “present in the United States in violation of the law,” and he was “required to depart” {id.). Caesar acknowledged that this was the only denial of an application for F-l status a student received during her tenure at SUNY Maritime, among approximately 10 such applications that were submitted (tr at 159).
As a result of this letter, Gani hired an immigration attorney, and sought the school’s assistance in getting USCIS to reconsider its decision (tr at 34). By letter dated August 24, 2007, Caesar informed USCIS that she had been “under the impres *749 sion that an application for Mr. Gani was sent in once classes first began and he could show proof that he had registered for courses” (claimant’s exhibit 17). She also indicated that she was “unsure as to why the application file date was not until May 21, 2007” (id.). In a subsequent letter on Gani’s behalf the next January, Caesar stated that from conversations with claimant “it is clear that he was not aware of the exact law not allowing him to study at all not even part time while his case was pending” (claimant’s exhibit 18).
Gani filed a motion for reopening or reconsideration of the USCIS’s denial on October 3, 2007. That motion was denied as well, on the ground that it was not timely submitted, and also because Gani had been attending regular classes without first obtaining student visa status, in violation of the 2002 rule (claimant’s exhibit 23).
On February 4, 2008, Gani’s immigration attorney wrote officials at SUNY Maritime to request a letter stating that the school had given Gani incorrect guidance regarding the legality of his attending classes before obtaining status as an F-l student. The attorney’s email said that such attendance had “now become the central issue in Mr. Gani’s application” (claimant’s exhibit 5). Two days later, Hoffman wrote to USCIS in support of Gani’s application (claimant’s exhibit 4). The letter stated that Gani was “allowed to enroll in courses at SUNY Maritime College while ‘in process’ for a visa”; the school now understood that “recent changes in the CFR no longer allow[ ] such enrollment”; and Gani’s enrollment was “through no fault of his own.” Hoffman asked that those classes not “prejudice his case in a negative manner” (id.).
Following submission of this letter, Gani once again sought reopening or reconsideration of his application. USCIS denied the request, again citing the 2002 rule and finding that Gani had failed to submit any new facts or other reason for reconsideration (claimant’s exhibit 24).
Meanwhile, at or about the time of USCIS’s August 2007 denial letter, Gani was offered a position with the TFS Company (TFS) in August, for a job he later characterized as an internship and “OPT” (claimant’s exhibit 20; tr at 64).[8] As has been made clear in the record and posttrial filings, OPT denotes *750 “Optional Practical Training,” a program under which an F-l student who has been enrolled in a USCIS-approved college for at least one academic year may be employed in a job related to his or her field of study (see infra at 761). Because of the USCIS’ denial notice, however, Caesar wrote TFS to make clear Gani could not be on its payroll until his immigration status could be resolved (claimant’s exhibit 21). TFS later rescinded the offer (see defendant’s exhibit E; tr at 36).
Ultimately, Gani resolved his immigration problems. He married a United States citizen in October 2008, and became a United States citizen himself around March 2013 (tr at 36). In addition, he eventually completed his coursework at SUNY Maritime and received his Master’s degree in 2008 (id. at 62). Claimant nonetheless claims that defendant’s conduct caused him injury, as it prevented him from taking the job offer at TFS, or any other job while he lacked legal status in the United States.
Discussion
I. Preliminary Matters
Before I consider the merits of Gani’s claim, several preliminary matters must be resolved. First, claimant has moved to amend his pleadings, which application defendant opposes. Second, I must clarify precisely which factual averments are at issue in the claim before me, and what record evidence supports them. Third, I must assess the defense of governmental immunity asserted by the State.
These matters are addressed, in turn, below.
A. Motion to Amend
At the pretrial conference, claimant sought leave to amend paragraph (33) of his pleading to change the statement that “defendants owed Gani a duty of care springing from a relationship of trust or confidence,” to say that they owed him a “special duty of care . ...” I directed that the matter be addressed posttrial, and in accordance with that directive, claimant has moved for leave to amend, and defendant has submitted papers in opposition. Defendant opposes the motion on the ground that it would be prejudicial, would impermissibly correct a jurisdictional defect, and would constitute the untimely assertion of a new claim.
Leave to amend a pleading is to be “freely given” (CPLR 3025 [b]), provided there is no “prejudice or surprise” to the *751 other party (McCaskey, Davies & Assoc. v New York City Health & Hosps. Corp., 59 NY2d 755, 757 [1983]). To show prejudice, defendant must give “some indication that [it] has been hindered in the preparation of [its] case or has been prevented from taking some measure in support of [its] position” (Loomis v Civetta Corinno Constr. Corp., 54 NY2d 18, 23 [1981]). Mere delay, without more, is not a sufficient ground for disapproving an amendment (see Kocourek v Booz Allen Hamilton Inc., 85 AD3d 502 [1st Dept 2011]; Moon v Long Beach Mem. Hosp., 173 AD2d 527 [2d Dept 1991]).
Courts have found amendment proper where the initial pleading apprised defendant of all the “facts and circumstances” of the case, and the amendment simply adds an additional cause of action or legal theory {see City of New York v Triborough Bridge & Tunnel Auth., 273 AD2d 157, 157 [1st Dept 2000]; see also McGhee v Odell, 96 AD3d 449, 450 [1st Dept 2012] [no prejudice or surprise from amendment to add cause of action where elements thereof can be “reasonably infer (red)” from existing pleading]; Covert Ave. Apts, v Town of Babylon, 134 AD2d 230, 230 [2d Dept 1987] [amendment to add causes of action granted when revised pleading contains the “identical factual allegations as the original complaint”]). That is the case here. Claimant does not ask to assert any new facts through the present application, but seeks merely to add a legal theory on the basis of facts already set forth in his claim. Specifically, claimant wishes to clarify that the duty pleaded is a “special” one.
A special duty may be demonstrated, inter alia, by showing
“ ‘(1) an assumption by the [State], through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the [State’s] agents that inaction could lead to harm; (3) some form of direct contact between [those] agents and the injured party; and (4) that party’s justifiable reliance on the municipality’s affirmative undertaking’ ” (Valdez v City of New York, 18 NY3d 69, 94-95 [2011]).
In his original claim, Gani made factual averments sufficient — at the pleading stage — to allege each of these elements (see claim ¶¶ 14-15 [State undertook to mail claimant’s package]; id. ¶ 17 [claimant had direct contact with state employee, and made her aware of problems with sending package]; id. ¶¶ 18-22 [State misled Gani through erroneous representation *752 that USCIS had received package]).[9] The State, for its part, has not shown prejudice or any other ground for denial of the claimant’s motion. The mere fact that the amendment was sought on the eve of trial is inadequate to defeat the motion (see Loomis, 54 NY2d at 22-24 [allowing posttrial amendment of claim, where no prejudice shown]).
For these reasons, I grant Gani’s application to amend his claim.
B. Factual Issues
Claimant does not appear to allege, and in any event has not shown, any wrongdoing on defendant’s part in connection with the mailing of the DHL package. Rather, Caesar testified credibly that she brought the package to the campus police booth for pick up, and the evidence at trial divulged no basis for finding this was done negligently. The claim, then, rests on two allegations:
• Caesar’s erroneous representation to Gani that the package had been received, which led Gani to take no further steps to ensure that it was timely; and
• SUNY Maritime’s incorrect advice that Gani could take classes at the school while he was awaiting the outcome of his application to change status.
I find that the record supports Gani’s factual account in regard to these events. There is essentially no disagreement as to the first assertion, and it is unclear whether there is as to the second. Caesar conceded at trial that she did not know that an individual could not attend classes until that person had actually been granted F-l student status, and did not recall whether she had ever said the contrary to Gani (tr at 135). Indeed, she characterized his attendance at classes without F-l status as “reasonable” {id. at 169). While Caesar testified that she nevertheless believed Gani’s continued attendance at classes to be his fault — to the extent it was anyone’s {id. at 144) — that is *753 a legal question, not a factual one. And Gani’s statement that Caesar advised him that he could attend classes in the 2007 spring semester receives support from Howard, who testified to his understanding that Caesar had contacted USCIS to confirm that Gani would be allowed to attend classes prior to the approval of his F-l student status (see Howard deposition at 56-57).
Caesar said at her deposition and at trial that she could not recall telling Gani that he could legally attend classes before he became an F-l student (Caesar deposition at 156), and claimant’s exhibit 3, containing instructions for filling out the 1-20 form, appears to caution readers not to take classes until their status is adjusted. To the extent the record reflects any factual disagreements in this regard, however, I resolve them in claimant’s favor. Caesar was Gani’s primary point of contact with SUNY Maritime when he first decided to attend, and it is inconceivable that in their discussions the question of when he should begin his studies would not arise. Caesar specifically confirmed to Gani in writing in November 2006 that he would begin classes in the spring (claimant’s exhibit 6). Further, the record makes clear — and Caesar in no way disputes — that she believed that attendance during the pendency of an 1-539 application was entirely legal (as it had been prior to 2002). Indeed, when Caesar first wrote to USCIS on Gani’s behalf, she specifically mentioned his attendance at classes as a positive factor, which she conceded she would not have done had she believed it to be improper (see Caesar deposition at 152, 182). Finally, the form 1-20 instructions were modified each year, and there is nothing in the record that provides any reason to believe that those introduced at trial were given to Gani.
In light of the foregoing, I find that defendant told Gani, in error, that USCIS regulations permitted him to attend classes while his application to adjust status was sub judice. I turn, then, to the question of whether the State’s acts were covered by governmental immunity.
C. Governmental Immunity
Defendant State of New York contends that claimant’s suit is barred by the doctrine of governmental immunity. When the government has “acted in a governmental capacity,” this doctrine grants absolute immunity to discretionary actions, and immunizes ministerial acts except in certain delineated circumstances, where the governmental actor owes a special duty to claimant (Applewhite v Accuhealth, Inc., 21 NY3d 420, 425 *754 [2013]). When, however, the State acts in a proprietary capacity, it is subject to the same duty of care as any private actor carrying out the same functions (id.; Sebastian v State of New York, 93 NY2d 790 [1999]).
A proprietary function is one in which the government’s acts “essentially substitute for or supplement traditionally private enterprises” (Matter of Karedes v Colella, 100 NY2d 45, 50 [2003] [internal quotation marks omitted]; see also Bass v City of New York, 38 AD2d 407, 411 [2d Dept 1972], affd 32 NY2d 894 [1973] [“in certain instances ... to the extent the appellant is carrying out activities which traditionally have been engaged in by private (entities) it is . . . acting in a proprietary capacity and the imposition of liability on established principles of tort law would logically follow”]). In contrast, the State functions in its governmental capacity when its actions are “undertaken for the protection and safety of the public pursuant to the general police powers” (Applewhite, 21 NY3d at 425 [citation and internal quotation marks omitted]).
The same entity may perform both governmental and proprietary functions (see Miller v State of New York, 62 NY2d 506, 511 [1984]). Thus, in regard to SUNY, courts have found that it acted in its governmental capacity when charged with failure to provide adequate police protection (e.g. McEnaney v State of New York, 267 AD2d 748 [3d Dept 1999]), but in its proprietary capacity when sued “as a landlord by its ownership and control of the SUNY campus” (Miller v State of New York, 62 NY2d at 511).
The question at issue here — whether SUNY acts in a governmental or proprietary capacity in assisting a student from abroad to secure the requisite immigration status needed to study at a SUNY campus — is a matter of first impression, with no obvious analogy in the case law. Applying the general standards set forth above, however, I hold that the actions at issue are proprietary. SUNY, of course, shares its role as provider of higher education with numerous private institutions in this state. There is nothing in the record to indicate that Caesar’s responsibilities in advising and otherwise aiding foreign students were any different from those of comparable employees at nonpublic universities, or that they were impacted in any way by the fact that she worked at a state college. To the contrary, federal regulations provide that every campus must have at least one PDSO, with responsibilities identical to Caesar’s (see 8 CFR 214.3 [1] [1] [ii]). There is no apparent distinction *755 made in those rules between individuals who serve in this capacity at private colleges, and those who serve at public universities.
The State concedes that “public higher education is essentially a substitute for, or supplement to, the ‘traditional private enterprise’ of private education” (defendant’s brief at 7, citing Sebastian, 93 NY2d at 793), and therefore the provision of “educational services” at SUNY Maritime “could be characterized” as proprietary (id.). Nonetheless, it contends that the college was acting in a “dual role” that includes governmental functions, and that the actions at issue here are governmental, since they “most closely resemble filing errors made by employees of government agencies,” found by courts to be governmental in nature (id. at 7-8). But none of the decisions cited by defendant even discussed the distinction between proprietary and governmental actions, and they do not remotely stand for the proposition that such administrative tasks, regardless of the context in which they are performed, are governmental in nature.[10]
In light of the foregoing, I find that the actions alleged in the claim were taken in the State’s proprietary capacity, and thus the defense of governmental immunity is inapplicable.
The fact that defendant is not immune, however, does not relieve claimant of the need to prove each of the elements of a viable cause of action (see Daniels v Manhattan & Bronx Surface Tr. Operating Auth., 261 AD2d 115, 116 [1st Dept 1999] [fact that complaint addresses actions taken in public entity’s proprietary capacity “merely deprives (defendant) of its governmental immunity defense”; complaint nonetheless dismissed for failure to prove foreseeability]). For reasons set forth below, I find that claimant has failed to do so here, and his claim must therefore be dismissed.
*756 II. The Merits of Gani’s Negligence Cause of Action
Claimant has offered no evidence to show that Caesar intentionally said anything false. His case turns, then, on whether the State is liable in negligence for two erroneous representations which, I have found, were made to him by Caesar: that he could legally attend classes during the pendency of his immigration application, and that USCIS had received his change of status application in December 2006.
To prove a cause of action for negligence, claimant must show “(1) the existence of a duty on defendant’s part as to [claimant]; (2) a breach of this duty; and (3) injury to the [claimant] as a result thereof’ (Akins v Glens Falls City School Dist., 53 NY2d 325, 333 [1981]; see also Donald v State of New York, 17 NY3d 389, 395 [2011]). In regard to duty of care, claimant argues that defendant assumed a duty to him since it “undertook to provide a service and did so negligently . . . [so] that its conduct in undertaking the service somehow placed [Gani] in a more vulnerable position than he would have been in had [defendant] never taken any action at all” (see Nallan v Helmsley-Spear, Inc., 50 NY2d 507, 522 [1980]).[11] Such a duty arises when defendant’s statements “had foreseeably led [claimant] to change his own conduct — for instance by giving him a false sense of security” (Heard, 82 NY2d at 72-73), or when defendant’s actions “created a new risk [or] induced [claimant] to forego some opportunity to avoid risk” (Richardson v Lenox Terrace Dev. Assoc., 41 AD3d 108, 109 [1st Dept 2007], quoting Heard, 82 NY2d at 73).
Caesar’s representation regarding the federal government’s receipt of Gani’s application meets this test. Here, Caesar undertook to mail Gani’s application. Gani and Caesar had numerous contact thereafter {see tr at 26), and she provided a specific assurance to Gani that she had spoken to USCIS, and *757 they had confirmed their receipt of the application (claimant’s exhibit 10; see Heard, 82 NY2d at 74 [“when one party seeks specific information from a second party, and the second party exclusively controls the information and purports to investigate the matter before responding, liability may be found” (citation omitted)]). While defendant maintains that Gani was free to confirm this information with the federal government himself, given the unequivocal representation by the university’s representative — the party who had mailed the document and was SUNY Maritime’s designated point of contact with immigration authorities — he had no logical reason to do so (see Caesar deposition at 180-181 [it was reasonable for Gani to rely on her representation that the application had been received]). Claimant testified credibly that he ceased worrying about whether the application would be processed after receiving Caesar’s email (tr at 29). And there is nothing in the record to suggest that he learned of this error until he spoke with Caesar on April 2, and received USCIS’ April 13 letter (claimant’s exhibit 13). By that point, Gani had stayed past the March 20, 2007 expiration of his original B1/B2 visa (see claimant’s exhibit 14).
I can find no such assumed duty, however, in regard to Caesar’s advice to Gani regarding his enrollment during the pendency of his 1-539 application. First, the record evidence does not demonstrate that such recommendations placed Gani at greater risk, or led him to change his conduct to his detriment. Claimant has not shown what he might have done had he not followed this advice — whether he would have returned to Turkey to prepare his application there, or stayed in the United States to begin classes at some later point, or taken some other, undisclosed step. As set forth in greater detail below, he has failed to show how any of these alternatives would have avoided the harm he now claims to have suffered as a result of defendant’s actions — the loss of a job offer he received in August 2007, or some subsequent employment opportunity (see Duff v Grenadier Realty Corp., 247 AD2d 577 [2d Dept 1998], citing Nallan, 50 NY2d at 522-523 [rejecting claim based on assumed duty where plaintiff failed to show he was “put in a (worse) position” by defendant’s actions]).[12]
*758 Gani points to no other specific act or statement by which SUNY Maritime assumed such a duty, and he makes no argument on this point in his posttrial submissions (see claimant’s brief at 11-13; reply brief at 10-12).[13] In essence, then, Gani’s argument is that since Caesar advised him on the relevant regulations, she had a duty to do so with due care (see reply brief at 10). But Caesar was not an attorney, and universities have no fiduciary relationship with their students (see Gomez-Jimenez v New York Law Sch., 103 AD3d 13, 18-19 [1st Dept 2012] [“plaintiffs have not alleged any special relationship or fiduciary obligation requiring a duty of full and complete disclosure from (law school) to its prospective students”]; Sweeney v Columbia Univ., 270 AD2d 335, 336 [2d Dept 2000] [“The relationship between a university and a student is contractual in nature”]). Claimant’s argument, then, essentially reads the “assumed duty” requirement out of the law, and renders a university employee who provides advice regarding potential legal consequences of any act the guarantor of its accuracy.
Were I to adopt claimant’s position, universities would become de facto insurers of every representation regarding the state of the law made by non-attorneys on their staff, and answerable in damages for the consequences of any errors. Given the “byzantine world of immigration law” (Suppiah v Kalish, 76 AD3d 829, 833 [1st Dept 2010]) — exemplified in the case herein by the change in a long and complicated regulation that rendered Gani’s attendance at class a violation — such a result is particularly unwarranted here. Moreover, Gani has failed to show that the information provided by Caesar was uniquely held by defendant. Rather, the representation concerned a matter set forth in the Code of Federal Regulations, as to which Gani could have sought advice from an immigration attorney, or directly from the USCIS (see Caesar deposition at 61 [Caesar spoke to USCIS through its toll-free number]).[14]
*759 For all these reasons, I find that defendant did not assume a duty to Gani by advising him erroneously that he could attend classes during the pendency of his adjustment of status application.
Finally, although I find that Gani has demonstrated the “duty” element in regard to Caesar’s representation that USCIS had received his application, he still must prove that this statement was the proximate cause of some legally cognizable harm to him. This, he cannot do.
To prove proximate causation, claimant must show that defendant’s conduct “directly produces an event and without which the event would not have occurred” (Giuffrida v Citibank Corp., 100 NY2d 72, 80 [2003] [internal quotation marks and citation omitted]). In other words, claimant must show defendant’s conduct to be a “substantial causative factor” of the harm alleged {id. [citation omitted]).
Claimant concedes that defendant’s errors neither caused him to be deported, nor stopped him from completing his studies at SUNY Maritime, nor prevented him from becoming an American citizen. Gani contends, however, that they did bar him from getting a job in 2007 and for some time thereafter, and that is the basis for his damages claim.[15]
Specifically, claimant asserts that had he not been denied the visa, he would have been gainfully employed beginning in the summer of 2007. This claim is premised on a job offer that Gani received on August 1, 2007, from a company which gave him an internship. Gani also contends that he was unable to obtain any other position until he regained lawful status in February 2010, following his marriage (claimant’s brief at 12).
*760 Any causal connection between defendant’s negligence and the alleged injury, however, can only be made via a highly tenuous string of inferences, many of which are dependent upon possible conduct by third parties, as well as assumptions that do not appear to have support in the relevant immigration law. I thus find that the injuries alleged are far too remote, and any causal relationship between them and the State’s wrongdoing too attenuated, to demonstrate proximate causation.
Specifically, to rule for claimant on this issue, I would need to find as follows:
First, I would need to hold that but for Caesar’s erroneous representations, claimant would have received approval from USCIS to adjust his status. That finding, however, faces two obstacles. First, the determination as to whether to grant adjustment of status is within the discretion of USCIS (see claimant’s exhibit 15 [finding by USCIS that Gani’s “request for a change of nonimmigrant status does not warrant the favorable exercise of the Attorney General’s discretion”]). The only evidence that claimant cites to show that such approval would have been forthcoming in this case is that in Caesar’s experience, Gani was the only one of about 10 applicants who was denied student status (see Caesar deposition at 50 [no other student but Gani lost his or her status]). But, there is nothing in the record to show in what circumstances such applications are approved or denied, or what the likelihood is that Gani’s own case would have met with approval had he timely filed.[16]
Second, even if Gani’s application had been timely filed, he was found ineligible in any case because he attended classes before obtaining student status. While Gani argues that this, too, was a result of Caesar’s faulty advice, for reasons set forth above I have found that this aspect of Gani’s allegations is not actionable. The USCIS denials of Gani’s reconsideration applications, however, made clear that the application would be rejected on this other ground, regardless of its timeliness.
Third, even if Gani could hold the State liable for both the untimeliness of the application, and the fact that he was rendered ineligible by taking classes during its pendency, it is unclear how Gani could have cured these defects in such manner as he would have been eligible for the job offer he received *761 in August 2007. The alternatives available to Gani were: (1) to have obtained approval of his change in status before classes began (either by returning to Turkey and applying from there or adjusting his status prior to the commencement of the spring semester classes); or (2) to have commenced his studies at SUNY Maritime at a later time.
I find no evidence, however, to indicate that absent defendant’s negligence his 1-539 application would have been approved timely for the spring semester, which commenced on January 8 (see claimant’s exhibit 10). To the contrary, Caesar testified credibly that the application would take 60 to 90 days to be processed, and thus would not be approved until after commencement of the spring term (see claimant’s exhibit 19; Caesar deposition at 51; see also Caesar deposition at 155). As to the second option, I cannot find causation based on such a counter-factual version of Gani’s university studies. He received his offer at TFS after serving as an intern there (tr at 64), and the record provides no evidence that, had Gani not commenced classes until the fall of 2008, he nevertheless would have received the same internship and same job offer at some later point.
Fourth, even if I were to find that absent the State’s negligence, Gani would have been able to obtain lawful F-l status, he cannot prevail unless I also find that he would have been eligible to accept the TFS offer. But that does not appear to be the case.
Claimant argues that he could have taken such a job via the OPT program (claimant’s brief at 6). OPT is defined in 8 CFR 214.2 (f) (10), which states in relevant part, that
“[practical training may be authorized to an F-l student who has been lawfully enrolled on a full time basis, in a Service-approved college, university, conservatory, or seminary for one full academic year. ... A student may be authorized 12 months of practical training, and becomes eligible for another 12 months of practical training when he or she changes to a higher educational level. . . . An eligible student may request employment authorization for practical training in a position that is directly related to his or her major area of study.”
Claimant contends that Gani could not participate in this program because the USCIS rejection of his application rendered him ineligible for “gainful employment” (claimant’s brief at 7). *762 But Gani would only have become eligible for OPT in any case after he had been enrolled in a “Service-approved college” for at least one full academic year (see 8 CFR 214.2 [f] [10], [11]). Indeed, Gani’s application for student status specifically cautioned that he “was not permitted to work off campus or to engage in business without specific employment authorization,” for which he could apply “[a]fter your first year in F-l student status” (claimant’s exhibit 7 at 2; see also Caesar deposition at 14 [citing as example of advice she gives to international students that they are “allowed to start working after (they have) been here a year”]).[17] There is no evidence that he met these time frames, as he had not completed a year at SUNY Maritime as of August 2007, when the TFS job was offered to him. Much less can I find that he would have been eligible had he delayed entry into SUNY Maritime, which would have made him ineligible for OPT until the middle of 2008.
Finally, the record does not contain any evidence that defendant’s actions caused him to lose some other job opportunity, and such possibility — premised on his having embarked on an educational program on a different schedule than the one he adopted — is entirely speculative.
In sum, while defendant’s conduct led to the initial denial of his application for student status, he was nonetheless able: (1) to complete his degree; (2) to obtain legal status in the United States; and (3) ultimately, to become an American citizen. While he could not take the job he was offered in August 2007, Gani has not shown that his failure to obtain lawful student status “directly produce[d]” this result, and that claimant would have obtained the job absent the State’s negligence. To the contrary, any such finding requires a series of inferences and assumptions that stretches the concept of “proximate cause” well beyond its breaking point. As a result, any causal connection between the State’s negligence and any harm suffered by claimant is “too attenuated and speculative” to support a finding that defendant’s conduct was the proximate cause of the harm he al *763 leges (see Williams v State of New York, 18 NY3d 981, 984 [2012]). For these reasons, I find that claimant has failed to prove all the elements of a negligence claim, and his action must therefore be dismissed.

. A B1/B2 visa is a “visitor’s visa,” allowing the holder to visit the United States temporarily for business (Bl) or tourism (B2). The holder may not engage in study or employment, and the length of stay is limited (tr at 102; claimant’s exhibit 3 at 2).

. Caesar testified that she was a Designated School Officer, and at some unspecified point became the PDSO, which gave her some additional functions, such as correcting mistakes on certain forms (Caesar deposition at 31). Although she did not recall the date on which she received the new title, she acknowledged that she “probably” served as PDSO at the time Gani was a student (see tr at 128).

. Caesar stated that she advised Gani that this would be the preferable option (id. at 104).

. Caesar distinguished between applying for an F-l student visa, which must be done in the applicant’s country of origin, and a change of nonimmigrant status to that of an F-l student, which can be accomplished via an application filed in the United States (see tr at 107). Caesar did not indicate that there was a practical difference for the applicant in the outcome of these two processes.

. At trial, and during her deposition, Caesar stated that she did not recall whether she had advised Gani that he could take classes while his 1-539 was pending (tr at 135; Caesar deposition at 156). She agreed, however, that she did not advise Gani that he could not do so, and that the school allowed him to take classes (Caesar deposition at 147, 169).

. The precise timing of this call is not entirely clear from the record. Gani testified that it was “almost March” when this occurred (tr at 30). The USCIS letter, however, referred to a contact from Gani or his representative on April 2, 2007. It is not clear the contact referenced in the letter is the call mentioned above, or some other effort by claimant or Caesar to determine the status of the application. In her deposition, Caesar conceded that by the time she and Gani realized that his application had not been received, “he was already out of status” (Caesar deposition at 174), which occurred on March 20, 2007.

. In a later email summary of the Gani situation sent by Caesar to Dr. Howard, she stated that she had been told by the USCIS Service Center that she would have to wait 60 to 90 days after sending the application before inquiring about it, since it took that long for it to be processed (claimant’s exhibit 19; Caesar deposition at 51).

. The contract itself was marked for identification as exhibit 22 at the pretrial conference, but the State declined to stipulate to its admission at the pretrial conference. The contract was never introduced into evidence, but *750 TFS’ offer is reflected in other documents and Gani’s testimony (see claimant’s exhibits 20-21; tr at 64).

. As set forth below, the State has failed to show that governmental immunity applies here, and claimant has ultimately failed to prove the elements of his claim — albeit for reasons unrelated to the proposed amendment. The proposed amendment could therefore be adjudged “futile,” or simply unnecessary, and rejected on that ground (see McGhee, 96 AD3d at 450 [amendment to claim may be rejected as futile]). But that would conflate the amendment motion (made orally prior to trial) and my ultimate resolution of the merits of the claim as a whole. As a conceptual matter, it makes sense to first address the motion to amend, so that the nature of the pleadings that are before me is clear, and then determine whether the evidence advanced at trial supports a valid cause of action.

. The first of the cited decisions, Matter of Lott v Goord (296 AD2d 631 [3d Dept 2002]), concerned a CPLR article 78 proceeding, not an action for damages, and made no reference to governmental immunity. The second, Weill v East Sunset Park Realty, LLC (101 AD3d 857 [2d Dept 2012]), concerned an error in the recording of a mortgage by the City Register — a function carried out uniquely by the government. The last, Holdman v Office of Ct. Admin. (38 Misc 3d 1219[A], 2012 NY Slip Op 52440[U] [Ct Cl 2012]), addressed the provision of erroneous advice to a government employee, but denied the claim on the ground that the government is not subject to estoppel. It referenced governmental immunity only in dicta, and without discussion as to whether the State’s actions were proprietary or governmental.

. Since claimant’s cause of action arises out of statements negligently made, it can be viewed as a claim for negligent misrepresentation. Such a claim requires proof of a “special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff” (Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 180 [2011]). I need not address whether claimant can meet this test, however. Negligent misrepresentation and assumed duty appear to be alternative theories of liability — the former based on a showing of a special relationship, and the latter on “words . . . that induce reliance” (see Ward v Edinburg Mar., 293 AD2d 887, 888 [3d Dept 2002]; see also Heard v City of New York, 82 NY2d 66, 73 [1993] [considering assumed duty and negligent misrepresentation alternatively]). Thus, liability for representations may, it seems, arise under an “assumed duty” theory, even when the elements of negligent misrepresentation are not present.

. When the claim was initially filed, it appeared that the act of taking classes prior to adjusting his status might preclude Gani from remaining in this country lawfully, or receiving his degree. Now that he has avoided such adverse consequences, the assertion that Caesar’s advice placed him in a worse position than he would have been in had he taken some alternative course is not self-evident.

. In the relevant sections of his briefs, claimant’s assumed duty argument addresses only Caesar’s mailing of his application and her representations in relation thereto. While he states that Caesar breached her duty of care in registering Gani for classes prior to receiving student status (reply brief at 10), he does not explain how the State assumed a duty in this regard.

. These findings do not diminish the difficulty facing a student from abroad in navigating the complexities of the immigration law, or the likelihood that such student would view the statements of university employees in such regard as gospel (see tr at 53). But the law does not hold individuals or entities liable, under either an assumed duty or negligent misrepresentation theory, simply because their statements are incorrect.

. The trial in this matter was bifurcated, so that the trial addressed only-liability. Since the issues of damages and causation can be intertwined, I questioned the parties as to whether it was their understanding that the issues of causation and damages would be addressed, if necessary, during the second phase of the trial. Claimant responded: “Yeah. It’s first based upon liability and then, well, the causation . . . because of the situation, he wasn’t able to obtain a job, which would be the causation for the damages” (tr at 96). In his posttrial brief, claimant acknowledged that proximate causation is an element of a negligence claim (claimant’s brief at 11), and characterized his injury as follows: “Since the USCIS denial left [Gani] without a lawful status in the U.S., he could not accept TFS’ employment offer, nor could he obtain any other gainful employment in this country until he regained his lawful status in February 2010” (id. at 12). Thus, the question of proximate causation was addressed at trial and is properly before me, although the scope of any damages is not now at issue.

. Indeed, Hoffman testified that Gani was unique amongst this group, as he was the only applicant for F-1 status that made his application from the United States, rather than returning first to his country of origin (Hoffman tr at 53-54).

. An exception to the rule barring a student from beginning employment prior to completing an academic year in connection with his or her F-1 status, is found under the Curricular Practical Training provision of 8 CFR 214.2 (f) (10) (i), which states that “Exceptions to the one academic year requirement are provided for students enrolled in graduate studies that require immediate participation in curricular practical training.” However, there is nothing in the record before me that indicates that this exemption applies to the matter herein.